UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INNOVATIVE HEALING
SYSTEMS, LLC,

      Plaintiff,

v.                                                      Case No. 8:25-cv-00048-WFJ-AEP

MIZELL MEMORIAL
HOSPITAL, INC.

      Defendant.

_____/

## ORDER

    Before the Court is Plaintiff Innovative Healing Systems, LLC's ("Innovative") Motion for Summary Judgment. Dkt. 44. Defendant Mizell Memorial Hospital, Inc. (the "Hospital") filed a response in opposition, Dkt. 50, and Innovative replied. Dkt. 55. The Hospital also filed a Motion for Summary Judgment, Dkts. 46, 48,[1] Innovative responded in opposition, Dkt. 53, and the Hospital replied. Dkt. 56. Upon careful consideration, the Court grants Innovative's Motion for Summary Judgment and grants in part and denies in part the Hospital's Motion for Summary Judgment.

---

[1] Defendant Hospital filed its Motion for Summary Judgment twice.

## BACKGROUND[2]

This dispute centers around an alleged breach of contract between a hospital and its hired consultant. Plaintiff Innovative is a consulting organization that assists hospitals in opening and managing advanced wound care facilities. Dkt. 41-1 ¶ 3. Innovative specializes in providing hyperbaric wound care. *Id.* ¶ 4. Hyperbaric wound care, also known as hyperbaric oxygen therapy, is a medical treatment during which patients breathe pure oxygen inside a pressurized chamber to enhance wound healing. *Id.* ¶ 5. Because wounds require oxygen to heal properly, exposing them to pure oxygen accelerates healing. *Id.* Defendant Hospital, located in Opp, Alabama, is a private, not-for-profit, acute care facility. Dkt. 41-2 at 2, 5; Dkt. 47 ¶ 1. The Hospital's active medical staff consists of physicians and surgeons in family practice, pediatrics, radiology, gynecology, and general surgery. *See* Dkt. 41-2 at 5.

### I.      The Wound Healing Institute Management Agreement

On October 23, 2019, the Hospital and Innovative entered into the Wound Healing Institute Management Agreement (the "Agreement"). Dkt. 43 ¶ 6; Dkt. 47 ¶ 3; *see* Dkt. 41-3 at 32:21–33:9; Dkt. 41-3 at 50–83 (showing the Agreement and attachments). The Agreement memorialized the parties' intent to establish an outpatient "wound care center" on the Hospital's campus. Dkt. 41-3 at 33:17-23; *see*

---

[2] This factual background section is primarily derived from the parties' statements of undisputed material facts. *See* Dkts. 43, 47.

Dkt. 41-3 at 50 ("[The] Hospital desires to establish a comprehensive outpatient WOUND HEALING INSTITUTE in a site located [on its campus].").

Under the Agreement, the Hospital contracted with Innovative "to manage, operate, and direct the clinical and business operations of [the] Hospital's Wound Care Program." Dkt. 41-3 at 50. The Agreement also obligated Innovative to provide the contemplated wound care services "in a stand-alone modular building to be located on the Hospital premises" (the "Modular Building"). *Id.* at 57. The Hospital agreed to "make available to [Innovative], at no charge, a portion of the land upon which the Hospital is located . . . to permit [Innovative] to install" the Modular Building (the "Allocated Space"). *Id*. The Agreement further obligated the Hospital to "cooperate in any manner reasonably required by [Innovative] in obtaining all permits, licenses, and any other authorizations necessary for the planning, construction, and operation of the Modular Building." *Id*. Innovative was responsible for preparing the Allocated Space for the Modular Building's installation and for designing and installing the said building. *Id.* (showing section 4.3.4, which states that "[Innovative] shall[] contribute up to $400,000.00" to prepare, design, and install the Modular Building and the attached parking area). While the Agreement was "contingent upon obtaining the necessary licensing, zoning, permitting, and (if applicable) Certificate of Need for the project[,]" the Agreement did not contain any deadline for the satisfaction of this contingency. *Id.* at 67.

Importantly, under section 7.2 of the Agreement, "[n]either party may terminate this Agreement without cause before the expiration of the Initial Term." *Id.* at 59. In section 7.1.1, the Agreement defines the Initial Term as "commenc[ing] on the opening day of" the Wound Healing Institute "and will continue for a period of five (5) years thereafter." *Id.* Section 7.2.1 further articulates that:

> In the event of a termination of this Agreement by the Hospital during the Initial Term of this Agreement that is not in compliance with this subsection or where the Hospital is in breach of subsection 7.2.2, the Hospital shall pay the following amounts to [Innovative], as compensation and not as a penalty, and payment of such amount shall be [Innovative's] exclusive remedy for such termination during the Initial Term of this Agreement:
>
> > (i) If this Agreement is terminated *at any time after the date of execution of this Agreement* and on or prior to the first anniversary of the [opening date of the Wound Healing Institute], the Hospital shall pay [Innovative] a termination fee in the amount of Nine Hundred Thousand Dollars ($900,000).[3]

*Id.* at 59–60.

Section 7.2.2 of the Agreement governs termination for cause and enumerates the circumstances that constitute cause. *Id.* at 60. The six circumstances that constitute cause permitting the Hospital to terminate the Agreement are as follows: (1) Innovative's material breach, where the Hospital could terminate the Agreement with written notice "following prior written notice of [Innovative's] material breach

---

[3] The Court refers to this $900,000.00-fee as the "Termination Fee" in this Order.

4

of any obligations [under the Agreement] (which notice shall set forth in detail the nature of the breach), if such breach remains uncorrected for a period of thirty (30) days after [Innovative's] receipt of the initial written notice of default, or such longer time as may be necessary if such breach cannot reasonably be cured within thirty (30) days, so long as [Innovative] initiates efforts to cure the breach within such thirty (30) day period and diligently pursues same to completion"; (2) Innovative filing of a petition in bankruptcy; (3) the endangerment of the Hospital's patients' or employees' health and safety or the disruption of the Hospital's business operations; (4) Innovative's breach of any representations or warranties set forth in Section 6 of the Agreement; (5) Innovative's employment of any Hospital staff without prior approval from the Hospital during the term of the Agreement and for one year following the expiration or termination of the Agreement; and (6) the inability to obtain a bid for the Site Preparation Work that is mutually acceptable to both Innovative and the Hospital. *Id.* at 60–61.

## II.    Innovative's Performance under the Agreement

As relevant to this case, when an Alabama hospital undertakes a renovation or construction project, the Alabama Department of Public Health ("ADPH") must approve the building plans before construction may begin. Dkt. 41-3 at 19:17–20:6. As part of the ADPH's approval process for any renovation or construction, the ADPH requires a hospital to provide a Certificate of Need if a Certificate of Need is

required by law or some official documentation that a Certificate of Need is not required by law. *Id.* at 20:7–21:10. Applications for Certificates of Need, as well as requests for certification that a Certificate of Need is not required by law, are processed by the State Health Planning and Development Agency ("SHPDA"). *Id.* at 22:4-16.

Accordingly, to begin construction of the modular Wound Healing Institute, Innovative and the Hospital needed to obtain a Certificate of Need (or some certification that one was not required) from the SHPDA and ADPH approval of the building plans for the project. *Id.* at 21:11–22:16; *see also id.* at 60:7-22 (noting that until state approval was obtained, Innovative "couldn't do anything"). The process of obtaining ADPH approval of building plans is "a rather lengthy[,] specific process." *Id.* at 20:2-6. It is "not unusual" for it to "take several years" to obtain a Certificate of Need if one is required. *Id.* at 23:6-10. Moreover, from March 2020 through 2021, the COVID-19 pandemic likely affected the speed of approvals by Alabama state agencies. *Id.* at 23:11–24:20.

Following the execution of the Agreement on October 23, 2019, Innovative avers that it began efforts to design and install the Modular Building. Dkt. 41-1 ¶ 8. As part of these efforts, Innovative submitted preliminary plans for the project to the ADPH, which received them on September 4, 2020. *See id.* ¶ 16; *see also* Dkt. 41-1 at 25 (showing ADPH acknowledging receipt of preliminary plans for the Modular

6

Building). Innovative also sent revised preliminary plans, which the ADPH received on July 13, 2021. Dkt. 41-1 ¶ 16; *see also* Dkt. 41-1 at 29 (showing ADPH acknowledging receipt of the revised preliminary plans). However, by June 2021, the Wound Healing Institute still had not yet obtained approval from the ADPH. Dkt. 41-1 ¶ 18.

### III.    Site Change for the Modular Building

While ADPH approval was pending, the Hospital's former CEO, Kerry Goff, decided in June 2021 to identify a different site on the Hospital's campus for the Modular Building than the Allotted Space the parties had originally agreed upon. *Id.* ¶ 19; Dkt. 41-4 at 27:21–29:22; Dkt. 41-4 at 44 (showing the Hospital's board meeting minutes on June 10, 2021). During this time, Innovative avers that it had been communicating with the ADPH and making progress toward ADPH's approval, *see* Dkt. 52-1 ¶¶ 3–13, but the Hospital's decision to change the site halted any progress because any plans for a modular building on a different site would require their own approval process. Dkt. 41-1 ¶ 20; Dkt. 41-3 at 29:6–31:13.

The Hospital did not propose an alternative location for the Modular Building until March 2022. Dkt. 41-1 ¶ 21; Dkt. 41-1 at 33 (showing the Hospital's board meeting minutes on March 23, 2022, and discussing the "newly identified location" for the Wound Healing Institute). The parties began negotiating an amendment to

7

the Agreement to reflect the site change, but they ultimately did not execute any amendment. Dkt. 41-5 at 23:11-13.

On September 20, 2022, at a meeting of the Hospital's board of directors, the then-interim CEO of the Hospital, Michelle Sexton, acknowledged that Innovative was "still working on state approval . . . ." Dkt. 41-4 at 25:14–26:8; Dkt. 41-4 at 40 (showing the Hospital's board meeting minutes on September 20, 2022, and noting "[Innovative is] still working on state approval but are at a standstill. There is not a good out in the contract"). Nevertheless, the Hospital was seeking to get out of the Agreement. *See* Dkt. 41-4 at 25:21–26:13 ("Q. So is it accurate that, as of September 2022, the hospital was trying -- was looking for an out for this contract? A. I think it's fair that we had been -- we were already, what, three years in, and we were no closer to getting -- it didn't feel any closer to getting approval for the project."); Dkt. 41-4 at 40. On November 3, 2022, Innovative's representatives met with the Hospital's representatives, including interim CEO Sexton, to discuss advancing the Wound Care Institute project forward. Dkt. 41-1 ¶ 22; Dkt. 43 ¶ 43.

## IV.    The Hospital's Termination of the Agreement

On February 6, 2023, the Hospital's board of directors received an email drafted by interim CEO Sexton. Dkt. 41-3 at 44:10–45:1; Dkt. 41-3 at 84 (showing February 6, 2023 email). In this email, Ms. Sexton expressed concern that the Wound Healing Institute project "has been a huge worry of mine" and "could turn

out to be a continuous money loser for the [H]ospital." Dkt. 41-3 at 84. But she acknowledged that, concerning Innovative's efforts to obtain state approval for the project, Plaintiff was "on the right track now." *Id.*

Among the litany of grievances with the project, Ms. Sexton noted that Innovative had still not received state approval after several years; Innovative was now attempting to amend the Agreement; Innovative's "proforma" and lack of market share data do not hold up to scrutiny; the business of providing hyperbaric chambers has faced "increased regulation and payor resistance over the last few years"; and the Agreement stated that the Hospital was responsible for paying supply costs, which had "gone up substantially." *Id.* While Ms. Sexton "had hope[d] [Innovative] may choose to walk away" from the project, "[t]hat has not happened." *Id.*; *see also* Dkt. 41-3 at 45:20-25. As such, Ms. Sexton "recommend[ed] that [the Hospital] walk away from th[e] project" and "try to negotiate a settlement with [Innovative] to get out of the [Agreement]," but reminded the board that the Agreement "left no provision for an 'out' clause." Dkt. 41-3 at 84; *see* Dkt. 41-3 at 56:20–57:5.

Importantly, interim CEO Sexton never asserted that Innovative had breached the Agreement. Indeed, the Hospital's Rule 30(b)(6) representative acknowledged that none of the circumstances listed by Ms. Sexton's email constituted a breach of the Agreement. Specifically, the Hospital acknowledged that ADPH never issued

9

any conclusive determination that the Wound Care Institute would never receive approval and that it was possible that Innovative could obtain ADPH approval for the project in the future. Dkt. 41-3 at 49:11–50:5; 62:3-6. The parties never executed the requested amendment, and Innovative neither demanded nor required the Hospital to execute it to continue the project. *Id.* at 51:1-18. Innovative's projection of the Wound Institute's profitability not holding up to the Hospital's scrutiny was not a breach of the Agreement. *Id.* at 51:19–52:12. Likewise, Innovative's failure to produce market share data to support any financial proforma was not a breach of the Agreement. *Id.* at 52:13–53:2. As to concerns about newer impediments to profitability in the hyperbaric wound care business, this was not a breach of the Agreement either. *Id.* at 53:3–55:5. Finally, despite Ms. Sexton's concerns, the Agreement plainly provided that the Hospital would pay for supply costs associated with the project. *Id.* at 55:6–56:7.

On or about February 8, 2023, the Hospital terminated the Agreement. Dkt. 41-1 ¶ 23; Dkt. 43 ¶ 51; Dkt. 47 ¶ 14. The Hospital's termination of the Agreement did not involve the six circumstances that constitute cause under section 7.2.2: (1) the Hospital never gave Innovative written notice of any material breach of the Agreement or a thirty-day opportunity to cure any breach pursuant to section 7.2.2(i) of the Agreement, Dkt. 41-3 at 38:21–39:12, 69:6–10; (2) Innovative never filed for bankruptcy, *id.* at 39:20–24; (3) the Hospital never gave Innovative written notice

that its patients' or employees' health and safety was endangered or that its business operations were disrupted, or a thirty-day opportunity to cure pursuant to section 7.2.2(iii) of the Agreement, *id.* at 39:25–40:16; (4) the Hospital did not give Innovative written notice that Innovative breached any representation or warranty set forth in section 6 of the Agreement or a thirty-day opportunity to cure any such breach pursuant to section 7.2.2(v) of the Agreement, *id.* at 40:18-41:10; (5) the Hospital did not terminate the Agreement on the grounds that Innovative had employed Hospital staff during the term of the Agreement pursuant to section 7.2.2(vii), *id.* at 41:12-16; and (6) the Hospital did not give written notice that Innovative failed to obtain a bid for Site Preparation Work that was mutually acceptable to both the Hospital and Innovative pursuant to section 7.2.2(viii), *id.* at 42:19–43:2.

However, the Hospital did send Innovative a letter on October 5, 2022, before the termination, informing Innovative that the Hospital had contacted the ADPH and that the state agency told the Hospital that Innovative had not made any recent submissions seeking state approval. Dkt. 47 ¶ 15; Dkt. 48-5 at 2 (showing October 5, 2022, letter from the Hospital to Innovative). The letter also reminded Innovative that the Hospital "has been patient . . . as approvals are sought to build a wound care center," but "[o]ther opportunities have or will arise . . . and [the Hospital] needs to know [Innovative's] plans for the proposed wound care center." Dkt. 48-5 at 3.

11

Following the termination of the Agreement, the Hospital never tendered the Termination Fee to Innovative under section 7.2.1(i). Dkt. 41-1 ¶ 24; *see* Dkt. 41-3 at 59. Innovative's Chief Financial Officer ("CFO") avers that, before the Hospital terminated the Agreement, Innovative incurred approximately $420,000.00 in direct costs, including deposits for construction work and payments to surveyors, architects, and attorneys, and approximately $500,000.00 in overhead expenses, such as the time invested in the Wound Healing Institute by Innovative's officers, project developers, and human resources employees. Dkt. 41-1 ¶ 26.

## V.    Procedural History

On December 12, 2024, Innovative filed an action against the Hospital in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida. Dkt. 1-1. In its Complaint, Innovative asserts a breach of contract claim (Count I) and, in the alternative, an unjust enrichment claim (Count II) against the Hospital. *Id.* The Hospital removed the action to this Court pursuant to 28 U.S.C. § 1332 on January 9, 2025. Dkt. 1.

Innovative now moves for summary judgment on its breach of contract claim in Count I. *See* Dkt. 44. Innovative asserts that there is no genuine dispute of any fact material to whether the Hospital breached the Agreement by terminating the Agreement without cause and subsequently failing to pay Innovative the Termination Fee. *Id.* at 1–2.

The Hospital also filed a motion for summary judgment, arguing that Innovative's breach of contract claim in Count I fails because the Hospital properly terminated the Agreement for cause, and Innovative cannot show that it was possible to obtain ADPH approval for the Wound Healing Institute. Dkt. 46 at 3. As to damages, the Hospital also argues that the Agreement's language does not entitle Innovative to the Termination Fee and, even if it does, that the Termination Fee is unenforceable under Florida law as a penalty. *Id.* at 6–8. Finally, the Hospital seeks summary judgment on Innovative's unjust enrichment claim in Count II, contending that the Agreement governs the parties' relationship and precludes Innovative from recovering under its alternative equitable theory of unjust enrichment. *Id.* at 2.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of proving the absence of a

13

genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

This standard is especially important when there are cross-motions for summary judgment. "[C]ourts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023). "When parties jointly move for summary judgment, the court has three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *Id.*

Additionally, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking

district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

## DISCUSSION

Based on a careful review of the record, the Court finds that Innovative is entitled to summary judgment on its breach of contract claim because it has shown that there is no genuine dispute that the Hospital terminated the Agreement without cause and that Innovative incurred damages. This Order will proceed in two parts, first considering Innovative's motion for summary judgment on its breach of contract claim, and then turning to the Hospital's motion for summary judgment on the enforceability of the Agreement's liquidated damages provision and the unjust enrichment claim.

15

## I.    Innovative's Motion for Summary Judgment

The Court begins with Innovative's arguments that it is entitled to summary judgment on its breach of contract claim under Florida law.[4] "The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Carl Domino, Inc. v. Dixon*, 413 So. 3d 157, 167 (Fla. 4th DCA 2025) (quoting *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003)). The first element is undisputed, as both parties agree that the Agreement is a valid contract. Dkt. 43 ¶ 6; Dkt. 47 ¶ 3. The Hospital, however, argues that there is a genuine dispute about whether it breached the Agreement without cause, whether it was even possible for Innovative to obtain ADPH approval for the Wound Healing Institute, and whether Innovative is entitled to the Termination Fee. Dkt. 50 at 2–8. The Court will address each argument in turn.

### A. No Genuine Dispute as to the Hospital's Material Breach

Based upon the evidence in the record, there is no genuine dispute that the Hospital materially breached the Agreement by terminating the Agreement without cause prior to the expiration of the Initial Term.

As an initial matter, there is no dispute that the Hospital's termination of the Agreement was a breach. Section 7.2.1 of the Agreement plainly states that

---

[4] There is no dispute that Florida law applies to this breach of contract claim pursuant to the terms of the Agreement. *See* Dkt. 41-3 at 66–67 ("The laws of the State of Florida shall govern the interpretation, construction, and legal effect of this Agreement.").

16

"[n]either party may terminate this Agreement without cause before the expiration of the Initial Term." Dkt. 41-3 at 59. Section 7.1.1 provides that the Initial Term expires on the fifth anniversary of the Wound Healing Institute's opening day. *Id*. As such, a termination without cause prior to the fifth anniversary of the Wound Healing Institute's opening day would constitute a breach of the Agreement. In this case, when the Hospital terminated the Agreement on February 8, 2023, the Wound Healing Institute had not yet opened, and the Initial Term had not yet expired. Dkt. 43 ¶ 51; Dkt. 47 ¶ 14. Thus, there is no genuine dispute that the Hospital terminated the Agreement, which Defendant admits in its response. *See* Dkt. 50 at 2.

The more fundamental question, however, is whether this was a *material* breach. That is, whether the Hospital improperly terminated the Agreement without cause. "When focusing on the breach of the contract, not every breach permits the non-breaching party to cease performance. Instead, the failure to perform the contractual obligation must be central to the contract or, in other words, material." *Eclectic Synergy, LLC v. Seredin*, 347 So. 3d 27, 29 (Fla. 4th DCA 2022) (citation omitted). Indeed, "to rise to a material breach, a party's conduct must 'go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part.'" *Id.* (quoting *JF & LN, LLC v. Royal Oldsmobile-GMC Trucks Co.*, 292 So. 3d 500, 509 (Fla. 2d DCA 2020)).

17

Here, the Hospital points to section 7.2.2(i) of the Agreement, which allows either party to "terminate[] for cause upon written notice of a material breach of the other party's obligations, if the breach is not cured (or attempts to cure have not begun) within 30 days." Dkt. 50 at 2 (citing Dkt. 41-3 at 60). But none of the other circumstances in section 7.2.2 allowing the Hospital to terminate for cause are at issue. *See id.* The Hospital's corporate representative conceded as much in his deposition. *See* Dkt. 41-3 at 39:14-43:14; Dkt. 43 ¶ 50.

The Hospital now contends its October 5, 2022, letter from its attorney to Innovative was the "written notice" required under section 7.2.2(i). *Id.*; *see also* Dkt. 48-5 (showing the Hospital's October 5, 2022, letter to Innovative). More specifically, the Hospital reasons that it was Innovative's obligation under the Agreement to obtain ADPH approval for the Wound Healing Institute, and that the letter put Innovative on notice that it had breached its obligations by failing to obtain approval. Dkt. 50 at 2. The Court disagrees, as no reasonable jury could find that the Hospital's October 5, 2022, letter was a formal "written notice of the other party's material breach." Dkt. 41-3 at 60.

Beginning with the text of the Agreement, section 7.2.2(i) provides that either party may terminate the Agreement without penalty

> upon written notice following prior written notice of the other party's material breach of any obligations hereunder (which notice shall set forth in detail the nature of the breach), if such breach remains uncorrected for a period of thirty (30) days after the breaching party's

receipt of the initial written notice of default, or such longer time as may be necessary if such breach cannot reasonably be cured within thirty (30) days, so long as the breaching party initiates efforts to cure the breach within such thirty (30) day period and diligently pursues same to completion.

Dkt. 41-3 at 60. But the Hospital's October 2022 letter did not give Innovative notice of a material breach for several reasons.

First, the letter never "set forth in detail the nature of the breach" since Innovative never breached the Agreement in the first place. *Id.* It is undisputed that the Agreement never gave Innovative a deadline for when all necessary licensing and permitting for the project needed to be obtained. *See* Dkt. 41-3 at 67 (showing section 11.2 only stating that "[t]his agreement is contingent upon obtaining the necessary licensing, zoning, permitting, and (if applicable) Certificate of Need for the project."). As such, the Hospital's letter expressing frustration with Innovative's lack of permitting and approval from the ADPH cannot constitute written notice of a breach, as Innovative did not breach the terms of the Agreement.

Second, even a cursory review of the October 2022 letter shows that it does not resemble a typical notice of default. Nowhere in the letter did the Hospital's attorney (who was also their Rule 30(b)(6) witness) identify the correspondence as notice of a material breach of the Agreement under section 7.2.2(i). *See generally* Dkt. 48-5. This is especially true given the significant delay caused by the Hospital's decision to change the Wound Healing Institute's location, Dkt. 41-1 ¶¶ 19–21, and

19

their interim CEO stating that Innovative was "on the right track" towards state approval for the new location. Dkt. 41-3 at 84.

When discussing Innovative's failure to receive ADPH approval for the project, the letter neither stated that the Agreement was contingent on state approval nor informed Innovative that it was in breach of the Agreement for failing to obtain ADPH approval. Indeed, the letter does not even mention the Agreement. Instead, the Hospital's attorney wrote that the "purpose of this letter is to *ask for an update* on the plans that your clients . . . have to build, open, and run" the Wound Healing Institute. Dkt. 48-5 at 2 (emphasis added). The letter further explained that the Hospital's current leadership felt underinformed about the project's status because the former CEO of the Hospital (Kerry Goff) had recently and suddenly resigned and "left behind minimum documentation about any discussions, correspondence, etc. that occurred with your clients." *Id.* The letter ended by informing Innovative that "[the Hospital] needs to know [Innovative's] plans for the proposed wound care center" and requesting "a detailed answer, with strict timelines, on what [Innovative's] plan is for moving forward." *Id.* at 3. In short, the plain language of the letter demonstrates that its purpose was to obtain an update on the project's status from Innovative, not to provide Plaintiff with written notice under section 7.2.2(i) of a material breach of the Agreement. *See Flagship Resort Dev. Corp. v. Interval Intern., Inc.*, 28 So. 3d 915, 923 (Fla. 3d DCA 2010) (rejecting the plaintiff's

argument that it provided a written notice of an intent not to renew the contract since the language in the document actually indicated that the plaintiff was "willing to engage in further negotiations concerning its continued relationship with" the defendant).

Third, and perhaps most fatal to the Hospital's position, is that Defendant's corporate representative admitted that the October 2022 letter did not constitute notice of a material breach pursuant to section 7.2.2(i) of the Agreement. Dkt. 41-3 at 38:21–39:12 ("Q. Let me -- let me ask you this: is your what-the-heck-is-going-on letter the same thing as providing notice to Innovative that they were in material breach and that they had 30 days to cure right here? . . . A. It's -- no, it doesn't have that language."); *see also id.* at 69:6-10 ("Q. Okay. And again, nobody ever wrote, did a letter to [Innovative] that set forth any material breaches, told them they needed to cure, anything of that nature, correct? A. Not that I'm aware of. No, ma'am."). Moreover, the Hospital's CFO, Jana Wyatt, testified that she was unaware of any written notice of material breach given to Innovative by the Hospital. Dkt. 41-4 at 20:21–21:1. Similarly, as noted above, the Hospital's interim CEO, Ms. Sexton, sent an email to the Hospital's Board of Directors on February 6, 2023, in which she acknowledged that, concerning Innovative's efforts to obtain state approval for the project, Plaintiff was "on the right track now." Dkt. 41-3 at 84.

Even when considering the evidence in the light most favorable to the non-moving party, the Hospital's attempt to characterize the October 5, 2022, letter as a written notice of material breach under section 7.2.2(i) fails. On this record, no reasonable jury could find that the Hospital properly terminated the Agreement for cause. Therefore, the Court finds that the Hospital improperly terminated the Agreement without cause prior to the expiration of the Initial Term, which constitutes a material breach under Florida law.

### i.  Anticipatory repudiation affirmative defense

However, the Hospital contends summary judgment is still not warranted on Innovative's breach of contract claim since "Plaintiff cannot show it would have been able to perform its own obligations under the [Agreement], as it is required to do to succeed on that claim." Dkt. 50 at 3. In other words, even if the Hospital anticipatorily breached the Agreement, Innovative (as the non-breaching party) is still not entitled to damages since it was unable to perform its obligations under the Agreement. *Id.* at 4.[5] The Court finds this affirmative defense does not preclude summary judgment because the Hospital has not put forth any admissible evidence

---

[5] The Hospital's anticipatory repudiation argument is its eighth affirmative defense. *See* Dkt. 1-2 at 5. Where a party bringing a claim for relief moves for summary judgment, the party opposing the claim must raise all arguments or defenses that the opposing party believes preclude judgment on the claim in the moving party's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001). Thus, for an affirmative defense, the burden is on the opposing party to bring evidence supporting the defense, not on the moving party to negate the existence of the defense. *Id.* (citation omitted). Accordingly, the Court only considers the affirmative defenses that Defendant raises in its response to Plaintiff's motion for summary judgment. *See* Dkt. 50 at 3, 6–8.

that creates a genuine material dispute as to Innovative's inability to perform under the Agreement.

The Florida Supreme Court has explained that "[t]he holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself." *Hosp. Mortg. Group v. First Prudential Dev. Corp.*, 411 So. 2d 181, 183 (Fla. 1982). In other words, "[i]n order for an anticipatory breach of a contract to give rise to a claim for damages[,] the non-breaching party must show its ability to perform conditions precedent to performance by the breaching party." *Morley v. Trafalgar Developers of Florida, Ltd.*, 455 So. 2d 391, 394 (Fla. 3d DCA 1984); *see also Ryan v. Landsource Holding Co., LLC*, 127 So. 3d 764, 768 (Fla. 2d DCA 2013) ("To be entitled to damages based upon an anticipatory breach, the nonbreaching party must establish its ability to perform at the time of the breach.").

Here, the Hospital points to no admissible evidence in the record to support the assertion that the ADPH would never approve Innovative's plans for the Wound Healing Institute. The undisputed facts show that Innovative had been communicating with the ADPH and making progress toward achieving state approval, *see* Dkt. 43 ¶ 38, but the Hospital decided to change the site for the Modular Building, and Innovative needed to wait until the Hospital identified a new site before it could submit new plans to the ADPH for approval. *Id.* ¶¶ 20–21; Dkt.

23

52-1 ¶¶ 14–16 (showing sworn declaration from Innovative's CFO David DeMik stating that the site change halted progress towards ADPH approval since new plans would be required). When the Hospital identified a new site for the Modular Building in March 2022, the parties began to negotiate an amendment to the Agreement to reflect the new location. *See* Dkt. 43 ¶ 40; Dkt. 52-1 ¶ 17. While the parties discussed the proposed amendment to the Agreement, Innovative did not order building plans or otherwise pursue the construction or installation of the Modular Building. Dkt. 52-1 ¶ 18.

This delay, however, does not create a genuine factual dispute that Innovative would never obtain ADPH approval for the Wound Healing Institute. Indeed, at the time the Hospital decided to terminate the Agreement in February 2023, interim CEO Sexton's email to the Hospital's board noted that, regarding efforts to obtain state approval, Innovative was "on the right track," albeit much slower than the Hospital anticipated. Dkt. 41-3 at 84; *see also* Dkt. 41-5 at 14:13–15:21 (Ms. Sexton testifying that it seems like Innovative "had a renewed focus on trying to get things done" in 2023, and that "[m]aybe someone [at Innovative] had changed titles, or someone had . . . a new position or some such thing, and [Innovative] really wanted to see the project go through"); Dkt. 41-3 at 49:11–50:5, 62:3-6 (showing the Hospital's corporate representative acknowledging that ADPH never issued any conclusive determination that the Wound Care Institute would never receive

24

approval and that it was possible that Innovative could obtain ADPH approval for the project).

Despite this undisputed evidence, the Hospital points to its corporate representative's testimony that "it had been specifically informed by the State of Alabama that [the State] would not approve a modular building to be part of a hospital." Dkt. 50 at 4 (citing Dkt. 41-3 at 27:2-24). The Court, however, cannot consider such testimony, as any statement by an ADPH employee that a modular building would not be approved is inadmissible hearsay.

The Eleventh Circuit has been clear that "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (citation omitted). But a court may consider a hearsay statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1293–94 (citation omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Id.* at 1294.

Here, the Hospital's corporate representative, Gregg Everett, called the ADPH and talked to someone named Tony Dunklin, who told Mr. Everett that:

> [the ADPH] would not approve a modular building that -- to be part of a hospital. And I ask [Mr. Dunklin] why. And he said, well, look where it is. It's on the Florida line. Hurricanes and tornadoes come through there all the time. And we, we being [the ADPH], have concerns about the safety of modular buildings when high winds occur. So I was told

by Tony more than once [that] they would not approve a modular building as part of a hospital.

Dkt. 41-3 at 27:15-24. While this call with Mr. Dunklin may have happened, there is no sworn declaration in this record from Mr. Dunklin or any other ADPH employee that corroborates the truth of Mr. Everett's testimony. As such, the statement from Mr. Dunklin is hearsay because he did not make it under oath, the Hospital offers the statement to prove the truth of the matter asserted (i.e., that no ADPH approval would occur for a modular building), and no hearsay exception has been identified. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); *Johnson v. Spalding Cnty., Georgia*, No. 24-13531, 2025 WL 1902434, at *2 (11th Cir. July 10, 2025) (noting the plaintiff "cannot rely on [a sworn] declaration" that has hearsay statements "unless she can show that both levels of hearsay would meet an exclusion or exception to the hearsay rules").

Nor has the Hospital provided evidence showing that Mr. Dunklin or any other ADPH employee "will emerge and provide testimony on this point" at trial. *Jones*, 683 F.3d at 1294 ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."); *Johnson*, 2025 WL 1902434, at *2 (citation modified) ("Johnson has provided no evidence that Perdue would testify,

so Johnson has only provided a suggestion that admissible evidence might be found in the future, which is not enough to defeat a motion for summary judgment."). Therefore, the ADPH employee's alleged statement is inadmissible hearsay, *see* Fed. R. Evid. 802, and will not be considered when resolving the instant cross-motions for summary judgment.

Besides this inadmissible portion of Mr. Everett's deposition, the Hospital fails to identify any other admissible evidence to rebut the undisputed evidence that Innovative was still "on the right track" to obtain ADPH approval for the Wound Healing Institute. Dkt. 41-3 at 84. Therefore, even when construing the evidence in the light most favorable to the non-moving party, the Hospital's anticipatory repudiation affirmative defense does not preclude summary judgment on Innovative's breach of contract claim.

ii.  The affirmative defenses of frustration of purpose and impossibility do not excuse the Hospital's breach

Next, the Hospital argues that Innovative's breach of contract claim fails because it was impossible to obtain ADPH approval for the Modular Building, thereby frustrating the Agreement's purpose. Dkt. 50 at 5–6; *see also* Dkt. 1-2 at 5 (showing the Hospital's tenth affirmative defense as impracticability, impossibility, and frustration of purpose). The Court disagrees. As discussed above, the Hospital presents no admissible evidence showing that the ADPH would never approve the Wound Healing Institute. Indeed, the Hospital's response re-cites the same lines

from Mr. Everett's deposition that the Court already rejected as inadmissible hearsay. *See* Dkt. 50 at 5 (citing Dkt. 41-3 at 27:2-24).

More fundamentally, the Hospital may not rely on the equitable defenses of impossibility, impracticability, or frustration of purpose because—contrary to the Hospital's assertion—the Agreement allocated the risk of failure to obtain ADPH approval to Innovative, not the Hospital. Florida courts have noted that "[w]hile the foreseeability of a business risk's occurrence in the context of contractual defenses is generally an issue of fact, summary judgment may be entered in a breach of contract action where the business risk was expressly addressed by the parties' agreement." *Vereit Real Estate, L.P. v. Fitness Int'l, LLC*, 365 So. 3d 442, 449 (Fla. 3d DCA 2023) (citation omitted). As such, "if the agreement provides that a party assumes the risk that a future event may prevent the party from performing a contractual obligation, then the equitable defenses are unavailing in an action alleging the party's breach for non-performance." *Id.* (citation omitted).

Here, the terms of the Agreement show that Innovative assumed the risk of ADPH denying approval for the Wound Healing Institute. In the event of a denial by the State, the Hospital would have been free to terminate the Agreement for cause and without penalty, while Innovative would have lost its investment in the project and lacked any means to recover it. *See* Dkt. 41-3 at 57, 60–61, 67. The Hospital resists this conclusion, arguing that the contingency provision in section 11.2 did not

allocate the risk of ADPH denying approval to either party. Dkt. 50 at 7. While technically true when reading section 11.2 in isolation, the Florida Supreme Court has repeatedly warned that "[p]rovisions in the texts of . . . contracts cannot be viewed in isolation from the full textual context of which they are a part." *Allstate Ins. Co. v. Revival Chiropractic, LLC*, 385 So. 3d 107, 113 (Fla. 2024). When reading the contingency and termination-for-cause provisions together, it is clear that Innovative had the responsibility to seek ADPH approval to build the Modular Building, and a denial by the State would allow the Hospital to terminate the Agreement for cause. *See* Dkt. 41-3 at 57, 60–61, 67. As a result, the Agreement allocates the risk of state approval to Innovative.

The fact that Innovative bore the risk of ADPH approval is significant, as the Hospital did not terminate the Agreement because ADPH denied approval. Instead, the Hospital terminated the Agreement because the Hospital determined that the Wound Healing Institute "could turn out to be a continuous money loser for the [H]ospital." Dkt. 41-3 at 84. Indeed, in support of her recommendation that the Hospital "walk away from" the Wound Healing Institute project, interim CEO Sexton told the board that "[Innovative] has failed to gain the appropriate state approvals for the project. I think they are on the right track now[,] but alot [sic] of time and money has been wasted on a seemingly simple task," and "[w]e need to focus our resources on other things right now." *Id.* She also expressed concerns

29

about future supply costs to the Hospital and possible reimbursement limits or reductions for this type of wound care. *Id.*

In other words, the record shows that the Hospital terminated the Agreement before Innovative obtained a final determination from ADPH because the Hospital believed the Wound Healing Institute would be less profitable than originally anticipated, and that the approval process was becoming expensive[6] and time-consuming. *See id.* (listing grievances about the Wound Healing Institute project, including the fact that the hyperbaric chamber business "has faced increased regulation and payer resistance over the last few years"). Thus, the Court finds that the Hospital cannot rely upon the equitable defenses of impossibility, impracticability, or frustration of purpose under these circumstances. *Valencia Ctr., Inc. v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269 (Fla. 3d DCA 1985) (noting that "courts are reluctant to excuse performance that is not impossible but merely inconvenient, profitless, and expensive"); *Home Design Ctr. Joint Venture v. Cnty. Appliances of Naples, Inc.*, 563 So. 2d 767, 769–70 (Fla. 2d DCA 1990) ("As a general rule, a contract is not invalid, nor is the obligor discharged from its binding effect, because the contract turns out to be difficult or burdensome to perform.").

---

[6] Notably, the project was not expensive for the Hospital. The Agreement did not require the Hospital to contribute funds for obtaining ADPH approval or construction of the Wound Healing Institute until after the Wound Healing Institute's opening day. *See* Dkt. 41-4 at 19:3–20:12, 26:9-13; Dkt. 41-5 at 11:5-12.

Nor can the Hospital argue that circumstances beyond either party's control frustrated the purpose of the Agreement, where the Hospital terminated the Agreement before any true frustration arose. *See BRE Mariner Marco Town Ctr., LLC v. Zoom Tan, Inc.*, 682 F. App'x 744, 747–48 (11th Cir. 2017). Because the Agreement expressly addressed and allocated the risk of failure to obtain ADPH approval to Innovative, the Hospital may not rely on the equitable defenses of impossibility, impracticability, or frustration of purpose to defeat summary judgment.

### B. No Genuine Dispute as to Damages

The third and final element of Innovative's breach of contract claim is that it suffered damages. *See Carl Domino*, 413 So. 3d at 167.  The Court finds that there is no genuine dispute that Innovative has suffered damages due to the Hospital's breach and failure to tender the Termination Fee. Specifically, Innovative's CFO avers that Innovative's performance of the Agreement prior to the Hospital's breach caused Plaintiff to incur direct expenses and corporate overhead costs that cannot be recovered. Dkt. 41-1 ¶ 26; Dkt. 41-1 at 18–23. On the other hand, the Hospital does not provide any evidence, much less any disputed material evidence, that it rebuts Innovative's sworn declaration from its CFO. Consequently, because the Hospital terminated the Agreement without cause and failed to pay the Termination Fee, Innovative has suffered $900,000.00 in damages under the Agreement's liquidated

damages provision. *See* Dkt. 41-3 at 59–60; *see also Lefemine v. Baron*, 573 So. 2d 326, 328 (Fla. 1991) ("It is well settled that in Florida the parties to a contract may stipulate in advance to an amount to be paid or retained as liquidated damages in the event of a breach.").[7]

However, the Hospital disputes Innovative's claim to the Termination Fee as a result of the Hospital's breach. Pointing to the language in section 7.2.1 of the Agreement, the Hospital argues that Innovative can only recover the Termination Fee if the Hospital terminates the Agreement without cause during the Initial Term, that is, after the Wound Healing Institute's opening day. Dkt. 50 at 4–5 (quoting Dkt. 41-3 at 59). In response, Innovative maintains that the Hospital's argument ignores section 7.2.1(i), Dkt. 55 at 4–5, which states: "If this Agreement is terminated at any time after the date of execution of this Agreement and on or prior to the first anniversary of the" opening date of the Wound Healing Institute, the "Hospital shall pay [Innovative] a termination fee in the amount of Nine Hundred Thousand Dollars ($900,000)." Dkt. 41-3 at 59–60.

It is well-settled Florida law that courts are required "to read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). As such, "[w]henever

---

[7] As discussed in further detail below, when addressing Defendant's motion for summary judgment, the Court also finds that the liquidated damages provision is enforceable under Florida law and not due to be stricken as a penalty clause. *See Lefemine*, 573 So. 2d at 328 (outlining the two-pronged test "as to when a liquidated damages provision will be upheld and not stricken as a penalty clause").

possible, we must give each word and provision effect and avoid an interpretation that renders any term superfluous." *Paraiso CU-1, LLC v. PRH Paraiso Four, LLC*, 414 So. 3d 271, 275 (Fla. 3d DCA 2025); *see also Morgan v. State*, 295 So. 3d 833, 836 (Fla. 4th DCA 2020) (citation modified) ("Under the harmonious-reading canon, there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously. . . . The purpose for this canon is to make the provisions of the statutory text be interpreted in a compatible, not contradictory manner.").

Here, applying these canons of construction, the Agreement entitles Innovative to recover the Termination Fee. If the Court accepted the Hospital's interpretation that Innovative can only recover the Termination Fee if the Hospital terminated the Agreement "during the Initial Term," then the subsequent language in section 7.2.1(i) about "terminat[ion] at any time after the date of execution of this Agreement" would be rendered superfluous. Dkt. 41-3 at 59–60. The Court declines this incongruent reading and instead interprets sections 7.2.1 and 7.2.1(i) in harmony with each other. *See Morgan*, 295 So. 3d at 836. The Court interprets text of the Agreement to create two instances where the Hospital must pay a termination fee: (1) the Hospital must pay a termination fee if it terminates the Agreement without cause "during the Initial Term" (i.e., the five year period after the Wound Healing Institute opens), and (2) if the Hospital terminates the Agreement without cause "at

any time after the date of execution of this Agreement and on or prior to the first anniversary of the" opening date of the Wound Healing Institute. Dkt. 41-3 at 59–60. The undisputed facts show that the second instance applies since the Hospital terminated the Agreement without cause after the contract was signed but before the Wound Healing Institute opened. *See* Dkt. 41-1 ¶ 23; Dkt. 43 ¶ 51; Dkt. 47 ¶ 14. Therefore, the Agreement entitles Innovative to recover the Termination Fee from the Hospital under section 7.2.1(i).

Accordingly, the Court grants Innovative's motion for summary judgment on its breach of contract claim in Count I against the Hospital.

## II.    The Hospital's Motion for Summary Judgment

Turning to the Hospital's motion, Defendant repeats many of the same arguments it made in its response to Plaintiff's motion for summary judgment. Specifically, the Hospital reiterates that the material breach element has not been established since the Agreement was "properly terminated the contract for cause," and Innovative "cannot show it was able to fulfill its own obligations under the Management Agreement." Dkt. 46 at 3–5. The Court has already previously addressed these meritless arguments and incorporates by reference its prior discussion on these points. However, the Hospital's motion advances a new argument that Innovative has failed to establish the damages element of its breach

34

of contract claim because "it is an unenforceable penalty" under Florida law. *Id.* at 6–8.

The Court finds that the Hospital has failed to meet its initial (summary judgment) burden showing that the liquidated damages provision is unenforceable under Florida law. As mentioned above, "parties to a contract may stipulate in advance [] an amount to be paid or retained as liquidated damages in the event of a breach." *Lefemine*, 573 So. 2d at 328 (citation omitted). Florida courts apply a two-prong test to determine whether "a liquidated damages provision will be upheld and not stricken as a penalty clause." *Id.* (citation omitted). "First, the damages consequent upon a breach must not be readily ascertainable." *Id.* "Second, the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." *Id.* If a liquidated damages clause satisfies these conditions, the clause is enforceable unless "it is unconscionable in light of circumstances existing at the time of the breach." *Dade Nat'l Dev. Corp. v. Southeast Invs. of Palm Beach Cnty., Inc.*, 471 So. 2d 113, 117 (Fla. 4th DCA 1985) (citing *Hutchison v. Tompkins*, 259 So. 2d 129, 132 (Fla. 1972)). The Court will address each prong in turn.

35

### A. Innovative's Potential Damages Were Uncertain at the Time the Parties Executed the Agreement

At the time the parties entered into the Agreement, the damages Innovative would suffer if the Hospital terminated the Agreement prematurely were not readily ascertainable. The Florida Supreme Court has already recognized that it may be difficult, even for sophisticated parties, to calculate damages for a breach of a complex business relationship, like one involving profit-sharing or future performance, the cost of which is difficult to quantify in advance. *See Hawk's Cay Inv., Ltd. v. Brandy Marine of the Keys*, 524 So. 2d 681, 684 (Fla. 4th 1988) (concluding that the non-breaching party's damages were not readily ascertainable at the time the parties entered into the agreement where the agreement provided that the non-breaching party would share in the future net profits of the breaching party's business). Florida courts also recognize certain factors a party might consider in attempting to determine their expected loss, including "time . . . ; the restriction upon the use of capital; the inability to enter into other investments during the course of this project; expenses for architectural, engineering, and legal consultation; expenses for the services of buyer's personnel; and loss of anticipated profits." *Dade Nat'l Dev. Corp.*, 471 So. 2d at 116.

Here, the Agreement memorialized a complex business relationship between Innovative and the Hospital, with Innovative assuming significant business risk by investing time, resources, and human capital in the construction and management of

36

the Wound Healing Institute, while the Hospital's upfront cost only required allocating land for the Modular Building. *Compare* Dkt. 41-3 at 51–57 (showing Innovative's standards of performance, regulatory compliance, and duties under the Agreement), *with* Dkt. 41-3 at 57 (showing the Hospital's duties, including allocating the space upon which the Wound Healing Institute would be built). Innovative asserts, and the Hospital does not challenge, that Termination Fee was supposed to compensate Plaintiff for its "architectural, engineering, and legal consultation fees; expenses for the work on the project performed by Innovative's personnel; the loss of Innovative's anticipated profits; and the restriction on the use of Innovative's capital pending the recovery of its investment after the Wound Healing Institute's opening." Dkt. 53 at 14; *see* Dkt. 52-1 ¶ 19. The Hospital also does not dispute that Plaintiff's quantification of these expenditures was uncertain at the time the parties signed the Agreement. *See* Dkt. 56 at 4 (showing Defendant only addressing the grossly disproportionate prong, not the readily ascertainable prong). Given this uncertainty, there is no formulaic calculation that could have more fairly anticipated Innovative's damages.

Similarly, the Agreement required Innovative to perform in the future, which was difficult to quantify in advance. The time and resources required to obtain ADPH approval could not have been precisely anticipated, as the Hospital's corporate representative testified that the ADPH approval process could take

between two months and a year. Dkt. 41-3 at 22:21–23:10. He also testified that the COVID-19 pandemic "most definitely" affected the time it took the ADPH to approve projects through 2021. *Id.* at 23:11–24:10. Nor could Innovative have known that the Hospital would make a site change for the Wound Healing Institute two years after the parties executed the Agreement. *See* Dkt. 52-1 ¶¶ 14–16.

The Agreement further provided that the Hospital would compensate Innovative for its investment in and construction and management of the Wound Healing Institute by sharing a percentage of the net revenue. *See* Dkt. 41-3 at 75 (showing attachment 5.1, which states Innovative's management fee will be twenty-five percent of the net revenue from the Wound Healing Institute). Because the Wound Healing Institute's future net revenue was uncertain, the amount of Innovative's damages was not readily ascertainable at the time the parties entered into the Agreement. *See Hawk's Cay Inv., Ltd.*, 524 So. 2d at 684 (noting that while the contract allocated a percentage of profits between the parties, the "future share of profits was not" readily ascertainable). Therefore, because the Hospital's motion has totally failed to address this first prong, *see* Dkt. 46 at 7–8, the Court finds that the Hospital has failed to carry its initial burden of proving the absence of a genuine issue of material fact.

B. *The Termination Fee Is Not Disproportionate to Innovative's Actual Loss.*

Concerning the second prong, the Termination Fee is not grossly disproportionate to any damages that might reasonably have been expected to follow from the Hospital's breach before the first anniversary of the Wound Healing Institute.

Where a court finds that the liquidated damages amount is not disproportionate to the non-breaching party's damages, it errs in not awarding the liquidated damages amount. *RKR Motors, Inc. v. Associated Unif. Rental & Linen Supply, Inc.*, 995 So. 2d 588, 595 (Fla. 3d DCA 2008) (citation omitted) ("Unless the trial court found that the imposition of the liquidated damages amount would be 'unconscionable,' it was required, pursuant to prevailing law, to award the liquidated damages amount. . . . Thus, the trial court erred in not awarding the liquidated damages amount where it concluded that the liquidated damages amount was not disproportionate to the actual lost profits.").

Here, Innovative's CFO attested that Plaintiff incurred $920,000.00 in direct costs and overhead expenses in performing under the Agreement. Dkt. 43 ¶ 56; *see also* Dkt. 41-1 ¶ 26; Dkt. 41-1 at 18–23 (showing Innovative's invoices for various expenses). Innovative's CFO did not consider Innovative's potential lost profits in calculating this sum. Dkt. 43 ¶ 56. The Termination Fee is not disproportionate or unconscionable because Innovative suffered actual losses in an amount roughly

equal to the Termination Fee. *See RKR Motors, Inc.*, 995 So. 2d at 595; *see also Bayshore Royal Co. v. Doran Jason Co. of Tampa, Inc.*, 480 So. 2d 651, 655 n.3 (Fla. 2d DCA 1985) (noting that "[c]ases declaring liquidated damages clauses to be unlawful penalties typically involve a liquidated damages amount which is disproportionately *larger* than the amount of potential actual damages").

Notably, the termination provisions of the Agreement also appear to reflect the parties' consideration of the speculative risk that Innovative assumed by entering into the Agreement. While the Hospital was not required to contribute any financial investment to the Wound Healing Institute before its opening, Innovative was required to contribute up to $400,000 toward the design and installation of the Modular Building and would be repaid only from a portion of the Wound Healing Institute's future net revenue. Dkt. 41-3 at 57 (showing section 4.3.4). To reflect the disproportionate nature of the parties' investment early in the relationship, the Agreement provided that the Termination Fee would decrease each year the Wound Healing Institute remained open. *Id.* at 59–60. In other words, section 7.2.1(i)-(v) acknowledges that Innovative's actual loss resulting from the Hospital's termination of the Agreement without cause would decrease the longer the Wound Healing Institute remained open and collecting revenue. *Id.* (showing termination fees decreasing from $900,000 to $500,000). The Agreement likely would not have such a provision if the Termination Fee were designed as a penalty. Thus, the second

40

element of Florida's standard for enforceable liquidated damages provisions is satisfied, and the Termination Fee is enforceable under Florida law.

The Hospital's reply, however, argues that the affidavit from Innovative's CFO "provides no specification at all as to what the remaining claimed damages consist of, and thus absolutely no way for either Mizell or this Court to evaluate whether the claimed damages are accurate or properly recoverable." Dkt. 56 at 4. While the Hospital is correct that the CFO's affidavit is somewhat sparse, no evidence contests it. It is the Hospital's initial burden—as the moving party on summary judgment—to come forth with evidence showing the absence of a material fact on this issue, *Allen*, 121 F.3d at 646. And the portion of the Hospital's motion addressing the second prong fails to cite anything from the record. *See* Dkt. 46 at 7–9. Nor does the Hospital provide any facts or data from the record to support its view. Instead, the Hospital only makes conclusory, unsworn arguments that "[n]o reasonable person would expect that Plaintiff would incur $900,000 in damages before approval to begin construction," *id.* at 8, which is insufficient when moving for summary judgment. *See Celotex*, 477 U.S. at 323 (citation modified) (noting the movant's initial burden consists of a "responsibility [to] inform[] the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact").

Therefore, because the Hospital's motion has failed to satisfy its initial burden on summary judgment as to whether the Termination Fee is permitted under Florida law, the Court denies the Hospital's motion as to this portion of the breach of contract claim in Count I. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made.").

### C. Count II—Unjust Enrichment Claim

Finally, the Court need not spend much time on Innovative's unjust enrichment claim. While a plaintiff can "simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment," *Real Estate Value Co., Inc. v. Carnival Corp.*, 92 So. 3d 255, 263 n.2 (Fla. 3d DCA 2012) (citation omitted), "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008). Here, there is no dispute that there was an express contract between the parties and that the breach of contract claim in Count I involved the same subject matter as the unjust enrichment claim in Count II. *See* Dkt. 43 ¶ 6; Dkt. 47 ¶ 3. Indeed,

42

Innovative admits that its unjust enrichment claim is pleaded in the alternative to its breach of contract claim. Dkt. 53 at 4; *see* Dkt. 1-1 at 5. As discussed above, the Court already found in Innovative's favor on its breach of contract claim in Count I; therefore, the Court grants the Hospital's motion for summary judgment on Count II since Innovative's unjust enrichment claim fails as a matter of law.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Plaintiff Innovative's Motion for Summary Judgment, Dkt. 44, is **GRANTED** as to the breach of contract claim in Count I.

2. Defendant Mizell Memorial Hospital's Motion for Summary Judgment, Dkts. 46, 48, is **DENIED in part and GRANTED in part.** Defendant's motion is only **GRANTED** as to the unjust enrichment claim in Count II and **DENIED** in all other respects.

3. The Clerk is directed to **ENTER** final judgment in favor of Plaintiff Innovative Healing Systems, LLC on Count I against Defendant Mizell Memorial Hospital, Inc. in the amount of **$900,000.00**.

4. The Clerk is also directed to **TERMINATE** all deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida, on March 5, 2026.

*/s/ William F. Jung*

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**<u>COPIES FURNISHED TO:</u>**
Counsel of Record